In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
**NO. 09-21-00004-CV**

**COLTON MACPHERSON, Appellant**

**V.**

**LEILA SHAHIN AGLONY, Appellee**

**On Appeal from the 284th District Court**
**Montgomery County, Texas**
**Trial Cause No. 19-11-15649-CV**

## MEMORANDUM OPINION

Appellant Colton MacPherson bought a house from Appellee Leila Shahin Aglony, pursuant to a purchase agreement that contained an "As Is" clause. After MacPherson moved into the home, he discovered problems and he filed claims against Aglony.[1] The trial court found for Aglony and entered a take-nothing

---

[1] Prior to the bench trial, the trial court entered a summary judgment in favor of the other named defendants, Caroline Pena (Aglony's real estate agent), and Suzanne Anderson Properties, LLC, (the real estate company Pena was affiliated with at the time in question). The trial court granted Pena and Suzanne Anderson

judgment in favor of Aglony. In four issues on appeal, MacPherson challenges the sufficiency of the evidence supporting the judgment rendered by the trial court. We affirm.

## Background

In March 2017, MacPherson purchased a home in Conroe, Texas (the Property) from Aglony for the purchase price of $140,000. MacPherson, as the buyer, and Aglony, as the seller, had their own real estate agents in the transaction. MacPherson and Aglony and their relators used the Texas Real Estate Commission (TREC) One to Four Family Residential Contract (Resale)" form for the purchase of the Property. According to MacPherson, after he purchased the Property and moved in, he discovered defects that he did not expect based on the information Aglony had provided to him when he purchased the Property.

In November 2019, MacPherson filed Plaintiff's Original Petition, asserting claims against Aglony for alleged violations of the Texas Deceptive Trade and Practices Act ("DTPA"), fraud, fraudulent inducement, fraud in a real estate transaction, negligence, breach of contract, and conspiracy. According to MacPherson, before the sale Aglony conspired to make cosmetic changes to the Property to "hide its true state[]" and fraudulently induced MacPherson to purchase

Properties, LLC's motion to sever, and assigned the severed case a new trial cause number. Pena and Suzanne Anderson Properties, LLC are not parties to this appeal in limited context.

2

the Property without disclosing the Property's "true state[.]" MacPherson alleged that Aglony made "cosmetic upgrades to the Property in order to hide the fact that it had serious foundation and structural issues." MacPherson further alleged that Aglony improperly filled out the Seller's Disclosure and "failed to disclose the repairs that Aglony performed on the Property, including but not limited to repairs she performed on the floors, walls, and foundation." MacPherson sought damages for the costs of repair and replacement, including but not limited to, the costs to repair the foundation, roof, interior floor, interior walls, exterior walls, doors, siding, paint, and plumbing. MacPherson also sought damages for mental anguish, additional damages under the DTPA, exemplary damages, and attorney's fees.

A bench trial was held, and the trial court found against MacPherson on all claims and signed a final judgment ordering MacPherson take nothing on his causes of action against Aglony and awarding Aglony court costs. The trial court also signed findings of fact and conclusions of law. MacPherson appealed.

Evidence at Trial

Testimony of Colton MacPherson

Colton MacPherson testified he saw the listing for the Property on a real estate website. The listing of the home was admitted into evidence. MacPherson testified that the listing for the home stated the following:

> Walls recently painted with neutral colors, new carpet, new tile floors, updated light fixtures, new FCI outlets, new blinds throughout the

3

house, new double panel windows, new ceiling fans, totally renovated kitchen with granite countertops, totally renovated bathrooms with new toilets, tubs, external pipes and floors. Brand new stove, microwave, . . . garbage disposal.

According to MacPherson, these are the repairs that he believed the seller had made to the Property, and he had no reason to believe that the seller had made any other repairs.

MacPherson testified he drove to the Property and looked at the outside and looked inside through the windows to see if he would be interested in purchasing the Property. He hired a realtor who helped him make an offer of $140,000 to purchase the Property. The offer was accepted, and the parties signed a contract on July 4, 2017, and closed on the Property on August 3, 2017. The purchase contract was admitted into evidence. MacPherson testified that he never had any communications with the seller, Aglony. According to MacPherson, he was not told that the Property had been purchased at a foreclosure by the seller and he said if he had known that fact, he would not have purchased the Property because he had "learned from watching TV, you don't buy a foreclosed home. . . . It is usually a crap house."

MacPherson testified that "around the time of his offer" he was able to walk through the Property, except for the far back room, which was not accessible due to construction equipment and supplies. He testified that he could tell the paint had been touched up, and he did not notice anything wrong with the Property, such as cracks in the walls, ceilings, or windows. MacPherson testified he had the home

inspected by Ray Basinger, and Basinger's inspection report was admitted into evidence. According to MacPherson, the inspection report did not indicate that the Property had major defects of any kind. MacPherson testified that after he and Basinger talked over the report, MacPherson "felt like it was the perfect house for [him] and [his] family to move into."

MacPherson testified that he received the Seller's Disclosure Notice ("the Seller's Disclosure") during the contract period, and the Seller's Disclosure was admitted into evidence. MacPherson agreed that in the Seller's Disclosure, Aglony stated that she was an investor and had never occupied the property and was not aware of any previous condition. MacPherson testified that in the Seller's Disclosure, the seller stated that she was not aware of any items listed in Section 1 that were not in working condition or had defects or needed repair. Aglony did indicate on the Seller's Disclosure that she was aware of defects in the driveway. MacPherson testified that, based on Aglony's disclosure, he did not believe she had made repairs to the foundation or any structural modifications. MacPherson testified he believed Aglony's representations on the disclosure. MacPherson testified that he relied on the Seller's Disclosure. According to MacPherson, when he purchased the home he had no reason to believe that the seller had made any structural repairs to the Property, or that the seller had repaired the Property's interior or exterior walls or foundation, or that the seller had replaced doors in the Property.

According to MacPherson, within five to seven weeks after he moved into the Property, his father noticed a hairline crack on one of the walls of the Property. MacPherson testified that since his purchase of the home, and despite Aglony's disclosure that she was not aware of any defects in the doors, MacPherson had discovered that the doors were replaced or moved and doors had gaping holes behind them and had fallen off the hinges. Photographs of the Property prior to Aglony's remodel were admitted into evidence. MacPherson testified that after he purchased the home, he noticed repairs the seller made to the ceiling, such as "patch-up work" by the fireplace and tape and putty covering holes that were painted over. He believed the pictures in the listing of the Property showed the living room and dining room and showed some of the replaced windows and he testified that he had no reason to believe that any changes were made to the exterior or interior walls. At trial, when shown photographs from the same area prior to Aglony's remodel, MacPherson testified that it appeared structural changes had been made such as cutting the exterior wall, adding a new window, and that two interior walls apparently had been removed. According to MacPherson, at the time of trial, the ceiling was falling in at the location where the interior wall had been removed prior to MacPherson purchasing the Property.

MacPherson was also shown pictures of cracks in the concrete from prior to Aglony's remodel, and he testified that he was not aware of those cracks when he

purchased the Property and did not have any way of knowing about the cracks because he did not remove the installed carpet. MacPherson testified that fireplace cracks depicted in the photographs shown to him at trial from before Aglony's remodel existed at the time of trial in the same place, but the cracks were not visible at the time he purchased the Property. According to MacPherson, after he purchased the Property the cracks started as a hairline crack and grew wider. MacPherson testified that he was also not aware of cracks in the floor of the master bedroom as depicted in photographs he was shown at trial. MacPherson testified that if he had known that the seller had made the repairs to the walls and the floor, or if the seller had disclosed the repairs, he would not have purchased the Property. He testified he did not hire a foundation expert before he purchased the Property because he did not know he needed to.

MacPherson testified that about two weeks after he purchased the Property Hurricane Harvey hit, and weeks after the hurricane hit, he had his insurance company inspect whether the hurricane had caused any damage to the Property. According to MacPherson, there was no flooding in the neighborhood, nothing had fallen on the house, and his insurance company did not discover any damages to the Property related to the hurricane. The insurance inspector alerted MacPherson to a foundation issue, but the inspector told MacPherson that he needed to call a foundation company because it was a preexisting issue not caused by the hurricane

and not covered by insurance. MacPherson had Allied Foundation come look at the Property.

According to MacPherson, he had attempted to repair the Property and he removed a moldy wall in the guest bathroom that he believed was caused by the use of non-treated wood. MacPherson testified that despite the seller telling him that she had replaced the plumbing and plumbing fixtures, within a week of living in the house the main line was clogged by a root causing the water to not drain and the toilet to not flush, so he had to dig up the line and replumb it himself. He also had a friend replace the fixture inside the wall of the guest bathroom because the hot water would not turn off. MacPherson testified that the plumbing fixtures were not new, and the O-rings were worn out.

Pictures of the Property taken in June 2018 were admitted into evidence. According to MacPherson, the photographs showed a crack in a wall, and he stated the crack had opened up where he could almost put his finger in it and there appeared to be a caulk-like substance that had been used to fill in the crack. MacPherson testified that the crack looked the same or worse than the picture of the crack made prior to Aglony's remodel. He testified he was unable to use his fireplace because using it with cracks on the side of it is a safety issue. MacPherson testified that within a week or two of him moving into the house, a shelf in the master bathroom that had been improperly installed fell, as depicted by one of the photographs. According to

8

MacPherson, another photograph showed how the corners of the master bathroom shower "opened up[]" over the last two and a half years, that the shower was "literally falling apart[,]" and he had used silicone to fill in the gaps. MacPherson testified that the tile walls had also cracked around the tub and toilet. MacPherson testified that it appeared that Aglony placed tape over a giant hole in the ceiling of one of the rooms, there is a gap where the sheetrock does not line up with the ceiling, and that the room "has a giant lean in it." MacPherson testified that he was not able to go in that room during his walk-through because it was full of equipment. MacPherson described some of the brickwork repairs as "shoddy[.]" According to MacPherson, the front door frame had separated and there were cracks up and down the wall. MacPherson testified that siding on the house had cracked where the seller had painted to "cover up things." MacPherson also testified there were cracks around a window and that a crack depicted in one of the photographs appeared to have had mortar of a different color applied to it previously. MacPherson testified that the photographs showed that cracks on the outside of the house appear now to have been caulked previously with a different mortar. A picture of the middle bedroom depicted what MacPherson described as a window he had to replace that was plexiglass instead of real glass and it showed that cracks had developed alongside the window. MacPherson testified that one of the photographs showed cracks on the corners of the door frames in the hallway to the middle bedroom and bathroom.

MacPherson testified that the door frames were cracked in the master bedroom, there was a crack in a corner on the ceiling, the window frame in the master bathroom was cracking, and the shower was "cracking down the walls[]" where the tile had been redone. MacPherson also testified that the ceiling sags in some rooms, and there are cracks in the garage sheetrock. He testified that photographs where he pulled the living room carpet back showed that the floor had been "covered in mortar to level out[]" the floor and that it was done during Aglony's remodel, and that the third bedroom in the back also had mortar on the floor when he pulled the carpet back.

According to MacPherson, he would not have purchased the house had he known the floors were cracked or had he known about the repairs to the living room or to the interior walls prior to his purchase. He testified that he believed Aglony was untruthful in her Seller's Disclosure and that she was aware of previous structural repairs and foundation repairs done during her remodel of the Property. He agreed that in Aglony's responses to Request for Admission which were admitted into evidence, she admitted that in 2017 she or her agents repaired the floors of the living room and the bedroom, repaired interior walls, replaced five windows, and that shotcrete was poured on the floors of the Property. Aglony's Responses to Interrogatories were also admitted and MacPherson agreed that in response to "[p]lease explain why you didn't feel the need to disclose any repairs[,]" she responded that "[t]he repairs that were made to the property were cosmetical and

evident to the naked eye. I didn't make any repairs to the property that were not visible at first sight."

MacPherson agreed that he checked the box on the purchase contract that stated that he was buying the Property "As Is," but he claimed that he did not know what that meant, and he did not consider that clause and only considered the Seller's Disclosure in deciding to purchase the Property. On cross-examination, MacPherson acknowledged that the purchase contract defined "As Is" to mean "the present condition of the property with any and all defects and without warranty except for the warranties of title and the warranties in the contract[,]" and he agreed that he was not precluded from inspecting the Property and negotiating repairs. He testified that after the inspection he negotiated small repairs with Aglony and she performed the repairs.

MacPherson testified he sent a notice to Aglony on December 18, 2017, under the DTPA and informed Aglony that she had marked "no" under whether she was aware of any defects or malfunctions in the ceilings, door, exterior walls, floors, foundation, slab, interior walls, roof, walls, fences and windows and that she did not fill out Section 3 of the Seller's Disclosure. The demand letter was admitted into evidence, and in it he made a demand of approximately $60,000 for repairs, including $11,000 for the foundation, $15,000 for exterior brick walls, and $8,200 for the roof.

The Contract

The contract for MacPherson's purchase of the Property from Aglony was admitted into evidence. The contract is titled "One to Four Family Residential Contract (Resale)" and indicates it is a form promulgated by TREC. At the time of its execution, under Paragraph 7B entitled "Seller's Disclosure Notice Pursuant to §5.008 Texas Property Code (Notice)[,]" an "X" was marked for section (2), which provided the following:

> Buyer has not received the Notice. Within 10 days after the effective date of this contract, Seller shall deliver the Notice to Buyer. If Buyer does not receive the Notice, Buyer may terminate this contract at any time prior to the closing and the earnest money will be refunded to Buyer. If Seller delivers the Notice, Buyer may terminate this contract for any reason within 7 days after Buyer receives the Notice or prior to the closing, whichever first occurs, and the earnest money will be refunded to Buyer.

An "X" was also marked for Paragraph 7D(1) indicating that MacPherson was accepting the Property "As Is" and Paragraph 7D expressly provided as follows, in relevant part:

> D. ACCEPTANCE OF PROPERTY CONDITION: "As Is" means the present condition of the Property with any and all defects and without warranty except for the warranties of title and the warranties in this contract. Buyer's agreement to accept the Property As Is under Paragraph 7D(1) . . . does not preclude Buyer from inspecting the Property under Paragraph 7A, from negotiating repairs or treatments in a subsequent amendment, or from terminating this contract during the Option Period, if any.

The Seller's Disclosure

The Seller's Disclosure was also admitted into evidence. It appears to be a form published by the Texas Association of Realtors, and it was provided to MacPherson for the Property. The Seller's Disclosure included the following language on the top of the first page in all capital letters:

> THIS NOTICE IS A DISCLOSURE OF SELLER'S KNOWLEDGE OF THE CONDITION OF THE PROPERTY AS OF THE DATE SIGNED BY SELLER AND IS NOT A SUBSTITUTE FOR ANY INSPECTIONS OR WARRANTIES THE BUYER MAY WISH TO OBTAIN. IT IS NOT A WARRANTY OF ANY KIND BY SELLER, SELLER'S AGENTS, OR ANY OTHER AGENT.

On the Seller's Disclosure, Aglony stated that at the time of the disclosure she was "not occupying" the Property and she stated she had "never occupied the Property[.]" When asked on the form if she was aware that any of the items listed in Section 1 were not in working condition, were defective, or were in need of repair, Aglony responded "Seller is an investor and has never occupied this property and is not [] aware of any previous condition." Under Section 2, which asked Aglony whether she was aware of any defects or malfunctions in the basement, ceilings, doors, driveways, electrical systems, exterior walls, floors, foundation/slab(s), interior walls, lighting fixtures, plumbing systems, roof, sidewalks, walls/fences, and windows, she put an "X" indicating "no" for every item except for driveways, where she put an "X" indicating "yes." Under Section 3, where Seller is asked if she was aware of any of the listed conditions (which included previous foundation repairs,

13

other structural repairs, and settlement among many other items), Aglony responded "Seller is an investor and is not aware of any previous condition[.]" Aglony signed the acknowledgment on the form that "the statements in this notice are true to the best of Seller's belief and that no person, including the broker(s), has instructed or influenced Seller to provide inaccurate information or to omit any material information." MacPherson signed the Seller's Disclosure acknowledgement stating that he received the Seller's Disclosure on July 14, 2017.

Testimony of Marcie McClimans

Marcie McClimans testified that she was MacPherson's real estate agent when he purchased the Property, and that he purchased the property for $140,000. McClimans testified that outside of what was listed on the MLS listing, she had no reason to believe that the seller had made any other repairs or changes to the Property, and there was nothing in the Seller's Disclosure that would have notified her or MacPherson that the seller had made other repairs other than those included in the disclosure. McClimans testified that in her training and experience, the purpose of the Seller's Disclosure is to disclose any type of repairs or anything that is wrong with a property, and that a seller is obligated to disclose those items. According to McClimans, in Texas a buyer of real property does not have an obligation to do their own investigation into what repairs the seller did "[b]ecause we go off the Seller's Disclosure and the inspector." McClimans agreed that in this

14

case at the top of the Seller's Disclosure was a notice that said that the Disclosure is not a substitute for any inspections or warranty. McClimans testified that the seller's statement on the disclosure that the seller was an investor and was not aware of any previous condition led McClimans to believe that the seller did not make any structural repairs. When McClimans viewed comparison photos from Exhibit 28 (photographs prior to Aglony's remodel) and Exhibit 29 (photographs from the listing of the Property at the time of MacPherson's purchase), McClimans testified that it appeared that Aglony had redone the windows and added an additional window by the door prior to selling the home to MacPherson.

McClimans testified that in the five years she had been a realtor, she had been involved in twenty closings and that this was the only one where the seller did not disclose repairs. According to McClimans, she spoke to the seller's agent, and McClimans was unaware that Aglony had purchased the Property through a foreclosure. McClimans testified that she discussed the inspection report with MacPherson, and she did not think there was anything in the inspection report that would have led her to believe Aglony had not disclosed repairs nor was there anything from the inspection that showed her MacPherson should not purchase the Property. McClimans testified that she believed that she walked through the Property "probably two" times with MacPherson and she did not notice anything wrong with the Property. McClimans testified that if she had known that the Property had cracks

15

in the concrete, she would have advised MacPherson to get different inspectors or an engineer to look at the Property because cracks in the floor can indicate foundation problems.

McClimans testified that the purchase was an "As Is" purchase and when that is the case, "you're going off the seller's -- or at that time purchasing the property until you have your inspections done, typically." She further testified that "you go off of what they've disclosed about the property[]" and "at that point you're purchasing it [']as is['] until you have inspections, if you choose to have an inspection done." McClimans testified that the inspector does not always uncover repairs a seller made. According to McClimans, based on the pictures shown to her at trial, she believed Aglony failed to disclose some repairs she made. McClimans testified that an inspection does not replace a Seller's Disclosure but instead "discloses anything that the [seller] knew about the property."

Testimony of Leila Shahin Aglony

Leila Aglony testified through an interpreter. According to Aglony, she remodels homes and has her own company. Aglony testified she hired contract workers that she was able to communicate with to remodel the homes she buys, the workers were not licensed, and she paid them mostly in cash. According to Aglony, she hires contractors and tells them what she wants them to do to the houses she purchases. Aglony testified she told them what color paint to use, what type of

16

flooring to put in each room, and what kind of countertops in the kitchen, and then the contractors gave her estimates for the cost of the repairs. At the time of trial she had purchased about ten properties through foreclosure sales and sold them.

Aglony testified that when she bought the Property in foreclosure it needed a lot of repairs. According to Aglony, when she purchases a property at a foreclosure, the seller does not give her any information about the condition of a property, and so she "guide[s] [her]self from what [her] realtor tells [her] regarding the conditions." Aglony testified that for the remodel in this case she hired a contractor from Home Depot based on a recommendation from another worker she had hired from there. Aglony testified that she told the contractor to paint the house, install carpet, install tile flooring in the bathroom, install granite in the kitchen, complete some yard work, and repair the fence. According to Aglony, she hired the workers to make "only aesthetic[]" changes. She testified she did not hire them to change the doors and could not remember if she hired them to change the windows. A page of her deposition from January 15, 2019, was admitted into evidence. She testified that she did not remember in her deposition why she had testified that the doors had been changed because, since that deposition and based on her review of pictures of how the house was when she bought it and then how it was finished, it does not appear the doors were not changed. At trial, when she was shown photographs of the living room floor depicting cracks in the concrete prior to her remodel, she testified "the

17

gaps were not open[]" and the HAR.com website and her realtor indicated there were no flooding problems or foundation problems with Property, and Aglony told the contractor to install carpet. Aglony testified that she did not think anything was wrong with the concrete or the floors and that when she walked through the Property, the cracks were not open. When asked about photographs showing where MacPherson had pulled back the carpet and showing where concrete had been poured to level the floor, Aglony testified that she had no knowledge of that, that she did not pour "shotcrete" in the living room, and her contractors did not inform her that they leveled the floor. She did not remember telling the contractors to install a new window on the exterior wall, but she agreed at trial that it had to have been with her approval. According to Aglony, she never directed her contractors to repair cracks and only told them to paint the house, which is what she paid for. She testified she was not present when the contractors were working on the house, she did not know how the contractors did the work, and she "only saw that [the Property] was well painted and that was all." Aglony testified that she directed the contractor to remove a portion of one of the walls to make the room look wider and the contractor told her that should not be a problem. According to Aglony, for materials for the remodel she purchased "just things that had to do with the color and for decoration . . . granite, lamps, [and] the corners for the bathroom," but that she purchased no materials for "patches[]" and only one piece of sheetrock was replaced

18

to her knowledge. She testified that the contractors charged her for material they used but she did not know "everything that they [were] going to do." She testified she did not have evidence in her possession that would show that she reimbursed anyone for the purchase of materials for the Property. She testified that she was charged an amount for the job, she did not know if her contractors made repairs to the interior walls of the Property, and that she did not pay for repairs or to repair cracks, but just paid for "aesthetics." She testified it took the contractors about three months to complete the job, and she returned once to the Property near the end of the three months.

Aglony testified that in her previous sales of other homes she had never disclosed on the Seller's Disclosure repairs she made to the homes, that it was not intentional that she did not disclose the repairs, and she was told by her agent how to fill out the disclosure. Aglony testified that regarding the Seller's Disclosure statement for the Property in this case, she handwrote the disclosures and then her realtor typed them into the form. She testified that in the Seller's Disclosure statement for the Property in this case when she stated that she was not aware of any previous conditions that she was "acknowledge[ing] that [she] wasn't aware of any of the items listed." According to Aglony, the buyer's realtor never came back to request that she fill out the disclosure statement completely.

19

Aglony explained that the agent she used when she sold the Property was the same agent that she had used when she purchased the Property, and Aglony purchased the Property for approximately $86,000 with the intention of selling it for around $140,000 (which she testified was the approximate average selling price of comparable houses in the neighborhood). Aglony testified that her realtor told her what repairs would add value so that Aglony could price a property at the level that she wanted. According to Aglony, the repairs she made to the Property here warranted a price increase from $86,000 to $140,000, and she would have purchased the Property for $140,000 after she finished her repairs.

Aglony testified that, to her knowledge, her team of people completed the repairs to the Property, and the Property was livable when she sold it. She testified that she explained when she sold it that she was an investor, and she never represented to the inspector or MacPherson's realtor that Aglony ever lived in the house. According to Aglony, her intention when she had her team perform repairs on the house was "[t]o leave it nice so that it can be lived in[,]" that it was never her intention to hide any defects or defraud any particular purchaser of the Property, and she did not lie on the Seller's Disclosure statement.

Testimony of Ray Basinger

Ray Basinger testified that he had been a home inspector for approximately ten years and had inspected around 500 homes. Basinger testified that he inspected

20

the Property in this case at MacPherson's request, and that there was not anything in the inspection that led Basinger to believe that the house had any problems that he failed to disclose in his inspection report. According to Basinger, his inspection report, as in all his other inspection reports, stated that "only those items specifically noted as being inspected were inspected" and that the inspection only addressed "components and conditions that are present, visible, and accessible at the time of inspection[.]" During trial, and after being shown Aglony's listing for the house, Basinger testified that he did not see anything during his inspection which led him to believe that Aglony had done anything outside of the repairs she disclosed in the listing. Basinger testified that when he inspected a home, he walked through it, opened all the windows and doors, checked for drywall cracks (especially off the corner of the doors and windows), checked for brick cracks and separation in the drywall, and looked for unlevel flooring.

Basinger testified that at the time he inspected the Property he did not see any repairs in the drywall and the walls had been freshly painted and the textures matched. He testified that the quality of the drywall and paint work was "very good," and he did not see any unmatched texture which sometimes indicated repairs had been made. According to Basinger, if a seller used unlicensed contractors to make repairs, he would want further evaluation of those areas. When Basinger was shown photographs of the Property before Aglony's remodel that depicted cracks in the

21

Property's concrete, Basinger testified that if he had known that those pictures depicted the condition of the Property when MacPherson purchased it, Basinger would have suggested that MacPherson might want to get an evaluation by a structural engineer or a foundation person. Basinger testified that neither he nor a prospective buyer could have discovered any foundation cracks under the carpet of the Property because they are not able to pull carpet back when doing an inspection. He testified that he noted some patching on the exterior brick but that it was common in older houses because, in Texas, brick is not structural, and he had no way of knowing when the patching had been done. According to Basinger, if the mortar patching started to crack soon after the buyer moved in, then Basinger would believe that it was a more recent repair and that there was still some movement going on with the property. He testified that, knowing what he knew at the time of trial and after being shown the photographs of "drywall not being drywall," he considered some of the repairs to have been poor repairs and he would want to know why drywall was not used. Basinger testified that at the time of his report, had he seen the photographs of the large foundation crack on the floor prior to the remodel, he would have recommended a foundation company and structural engineer. Basinger testified that if he had seen that the large crack had been repaired, then his recommendation to the buyer would have been "to get the paperwork of the repairs and the warranty."

On cross-examination, Basinger agreed that at the time he did his inspection he did not see any defects with the Property's foundation and that if he noticed issues with the roof it would have been noted in his inspection report. Basinger agreed that in his report he noted, "The exterior brick veneer appears to be repaired in several areas throughout[]" and that "[t]he repairs appear to be cosmetic but should be monitored." According to Basinger, when he said that it should be monitored, he meant that the buyer should keep an eye on the repaired area and if it separated then there was a problem. Basinger agreed that he also stated that "[t]he doors and windows have poor gaps around the outside[,]" and that "[t]he roof structure has been repaired near the living room, as seen from the attic side." Basinger testified he also noted in his inspection report that

> Exterior and interior walls of the house appear to have settled in multiple areas. The doors and windows have poor gaps around the outside. There are no drywall cracks, as the interior and exterior have been painted. I recommend monitoring for cracks.

Basinger testified that his statement regarding monitoring for cracks meant there were no cracks there, but if cracks appeared then there was a poor repair or the structure was moving. He testified that he also noted that there were irregular door gaps throughout the house, that the "gaps appear to be from structure settling[,]" and that he noted that he "recommend[ed] adjusting as needed." He also testified that he noted in his report that the driveway was cracked, but he testified that the cracked driveway did not indicate a foundation issue because the driveway was a separate

23

driveway pour and had nothing to do with the foundation. According to Basinger, he ultimately concluded in his report that the "foundation appeared to be supporting the structure as intended" because TREC requires all licensed inspectors to render their opinion on the foundation, he did not see any drywall cracks, and he could not tell that the floor had been leveled excessively. Basinger testified that the irregular door gaps did not necessarily indicate structural or foundation issues because a good contractor could hang a door perfectly, but with other contractors the doors could be "consistently a little bit off."

The Trial Court's Findings of Fact and Conclusions of Law

The trial court made the following findings, in relevant part:

1. Colton Macpherson purchased a home from Leila Shahin Aglony . . . (the "Property") for $140,000.00. He sues based upon alleged problems with the Property which he detected after the purchase and which he says were either misrepresented or concealed by Leila Shahin Aglony in the Seller's Disclosure (*but see* ¶2, *infra*). As he explained, he had 100% faith in what he read in the Seller's Disclosure. This lawsuit is based entirely on his claimed reliance on the Seller's Disclosure in purchasing the Property.

2. The earnest money contract states that at the time Colton Macpherson signed the earnest money contract, that he had not received the Seller's Disclosure. That is, he offered to buy the Property without relying on the Seller's Disclosure because he had not even received it yet. In fact, the recitation in the earnest money contract and the dates on the earnest money contract versus the Seller's Disclosure shows that he did not receive the Seller's Disclosure until ten days after executing the earnest money contract.

3. The earnest money contract recites that the sale of the property is As Is. Colton Macpherson explained that he did not and does not know

24

what that term means, but "as is" is defined in paragraph 7D of the earnest money contract as meaning "the present condition of the Property with any and all defects and without warranty except for the warranties of title and the warranties in this contract". Furthermore, Colton Macpherson both hired his inspector after the earnest money contract and negotiated repairs based upon that inspection. The parties agreed to some repairs and not to others prior to closing.

. . . .

5. Section 2 of the Seller's Disclosure asks if the seller is aware of any defects or malfunctions in the floors or foundation. Leila Shahin Aglony as seller said "no". The evidence showed that she was, in fact, unaware of any such defects or malfunctions. Indeed, there was no evidence other than speculation that there were defects and/or malfunctions in the foundation.

6. Section 3 of the Seller's Disclosure asked if the seller is aware of any prior foundation repairs, settling or soil movement. Leila Shahin Aglony as seller did not respond to Section 3 at all, so she made no representation there.

. . . .

10. Colton Macpherson hired a certified inspector of his choosing, Ray Basinger, to inspect the property.
>    a. The inspection occurred after the earnest money contract but prior to the time that Colton Macpherson received the Seller's Disclosure.
>    b. The Inspection Report revealed no major defects.
>    c. The inspector noted some things that could be considered signs of possible foundation movement, but opined that the foundation "appeared to be supporting the structure as intended."
>    d. Based on the Inspection Report, the parties negotiated making some changes/repairs prior to closing.
>    e. Colton Macpherson closed the sale.

11. Colton Macpherson as buyer had 7 days after his receipt of the Seller's Disclosure to decline to close the sale and get his earnest money back. *See* ¶7B(2). Likewise, because the Seller's Disclosure he received

was incomplete, he as buyer could have declined to close at any time before the closing date. Colton Macpherson closed the sale.

12. After closing, Colton Macpherson discovered ceiling repairs and wall repairs via patched sheetrock holes. He also saw a crack in the foundation when the carpet was pulled back. He also found several repaired and/or remodeled items which were not functioning. Had he known of these repairs and conditions, he would have not purchased the Property. Colton Macpherson's complaints, however, relate to the portion of the Seller's Disclosure related to defects and malfunctions— not to past repairs—and, again, he had not received the Seller's Disclosure at the time he made his offer to purchase the Property or even when the contract was executed (*see* ¶¶2, 5, 6, 7, 8, *supra*).

. . . .

14. Ray Basinger's Inspection Report [] noted that the foundation was not a problem. Colton Macpherson noted that his inspector was not a structural engineer, but neither was anyone involved in this transaction and no structural engineer or other expert testified at trial. In fact, Mr. Basinger opined that the foundation "appeared to be supporting the structure as intended," and although he said that he would have called for a structural engineer had he seen photographs of the foundation before it was carpeted, there was no evidence that the foundation was not supporting the structure as intended. There was speculation on that point, but no expert testified and, thus, none opined that the foundation was defective or failing.

. . . .

16. Leila Shahin Aglony is an investor who never lived on the Property. She purchases property to remodel and sell for profit. Her realtor told her the Property had no foundation issues. She never told her contractors to repair the foundation or to cover anything up; she asked them to lay carpet.

Conclusions of Law:

. . . .

3. There is no evidence or insufficient evidence to support a finding of liability against the Defendant. All liability depends on Plaintiff's claimed reliance on the Seller's Disclosure and his position that he would not have purchased the Property had the Seller's Disclosure revealed certain things about the Property, but the earnest money contract itself, coupled with the date on the contract and the date on the Seller's Disclosure, conclusively disproves his reliance because he had not seen the Seller's Disclosure when he made his offer to purchase the Property and he did not receive the Seller's Disclosure until 10 days after the earnest money contract was executed.

4. There is no evidence or insufficient evidence to prove damages. All damages claimed were related to costs of repairs, but there was no evidence of what the proposed repairs were, that such repairs were reasonable and necessary, that the amount to be charged for such repairs was reasonable and necessary, and, other than the demand letter, there was no evidence of even the price for repairs.

. . . .

Standard of Review

In a bench trial, the trial court, as factfinder, is the sole judge of the credibility of the witnesses and the weight of the evidence and is responsible for resolving conflicts in the evidence and drawing reasonable inferences from basic facts to ultimate facts. *See City of Keller v. Wilson*, 168 S.W.3d 802, 819-21 (Tex. 2005); *Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 625 (Tex. 2004). The factfinder may choose to believe one witness over another, and we may not substitute our judgment for that of the factfinder. *City of Keller*, 168 S.W.3d at 819. When a trial court makes specific findings of fact and conclusions of law following a bench trial and a reporter's record is before the appellate court, the findings will be sustained if there

is evidence to support them, and the appellate court will review the legal conclusions drawn from the facts to determine their correctness. *Trelltex, Inc. v. Intecx, L.L.C.*, 494 S.W.3d 781, 789 (Tex. App.—Houston [14th Dist.] 2016, no pet.). "Findings of fact 'have the same force and dignity' as a jury's verdict and are reviewable under the same standards of legal and factual sufficiency." *Foley v. Capital One Bank, N.A.*, 383 S.W.3d 644, 646 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (citation omitted). We review a trial court's conclusions of law as legal questions, de novo, and will uphold them on appeal if the judgment can be sustained on any legal theory supported by the evidence. *See BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002); *In re Estate of Stafford*, 244 S.W.3d 368, 369 (Tex. App.—Beaumont 2008, no pet.).

In a legal sufficiency challenge, we credit evidence that favors the finding, if a reasonable factfinder could, and we disregard evidence contrary to the challenged finding unless a reasonable factfinder could not disregard it. *See City of Keller*, 168 S.W.3d at 827. When a party challenges the legal sufficiency of the evidence supporting an adverse finding on an issue on which the party had the burden of proof, the party must show that the evidence establishes all vital facts in support of the issue as a matter of law. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001). In a factual sufficiency review, we examine all the evidence, and we will not set aside

the judgment unless it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

Discussion

In four issues on appeal, MacPherson challenges the sufficiency of the evidence supporting the judgment rendered by the trial court. We address his second and fourth issues first. In his second issue, MacPherson argues that the trial court erred in finding insufficient evidence supporting no liability against Aglony based entirely on the trial court's finding of no reliance. In issue four, MacPherson argues the trial court's order should be reversed because MacPherson provided uncontroverted evidence of each element of his claims for DTPA violations, statutory fraud, fraud by nondisclosure, breach of contract, and negligence. We interpret both of these issues as challenging the trial court's Conclusion of Law #3, wherein the trial court found no evidence or insufficient evidence to support a finding of liability against Aglony and we address those issues first. As explained above, we review Conclusion of Law #3 de novo, and will uphold it on appeal if the judgment can be sustained on any legal theory supported by the evidence. *See BMC Software Belgium, N.V.*, 83 S.W.3d at 794; *Stafford*, 244 S.W.3d at 369.

The trial court found in Finding of Fact #3 that the contract recites that the sale of property is "As Is" and that Paragraph 7D of the contract defines "As Is" as "the present condition of the Property with any and all defects and without warranty

29

except for the warranties of title and the warranties in this contract." MacPherson has not challenged that finding of fact on appeal.

"[A] seller of real estate is under a duty of disclosing material facts which would not be discoverable by the exercise of ordinary care and diligence on the part of the purchaser, or which a reasonable investigation and inquiry would not uncover." *Smith v. Nat'l Resort Cmtys., Inc.*, 585 S.W.2d 655, 658 (Tex. 1979). A seller has no duty to disclose facts that he does not know and is not liable for failing to disclose "what he only should have known." *Prudential Ins. Co. of Am. v. Jefferson Assocs., Ltd.*, 896 S.W.2d 156, 162 (Tex. 1995). In addition, a seller is not required to disclose any knowledge of past conditions on the property that are not known to exist at the time the Seller's Disclosure Notice is signed. *See Bynum v. Prudential Residential Servs., L.P.*, 129 S.W.3d 781, 795 (Tex. App.—Houston [1st Dist.] 2004, pet. denied). A seller has no duty to disclose a condition or defect which was previously repaired or remedied. *See Pfeiffer v. Ebby Halliday Real Estate, Inc.*, 747 S.W.2d 887, 890 (Tex. App.—Dallas 1988, no writ) ("[R]epairs correct defects, not prove their continued known existence."). Section 5.008(a) of the Texas Property Code requires a seller of residential real property to give the purchaser a written notice that "contains, at a minimum, all of the items in the notice prescribed by [that] section." Tex. Prop. Code Ann. § 5.008(a). The Seller's Disclosure Notice of Property Condition form must include a statement in capital letters that the notice

30

"is a disclosure of [a] seller's knowledge of the condition of the property as of the date signed by seller and is not a substitute for any inspections or warranties the purchaser may wish to obtain." *Id.* § 5.008(b). The notice "shall be completed to the best of seller's belief and knowledge as of the date the notice is completed and signed by the seller." *Id.* § 5.008(d). If a contract is entered without the seller providing the notice required by this section, the purchaser may terminate the contract for any reason within seven days after receiving the notice. *Id.* § 5.008(f). "[N]othing in the text of section 5.008 imposes liability on a seller for failing to exceed section 5.008's disclosure requirements." *Rohrs v. Hartz*, No. 09-19-00196-CV, 2021 Tex. App. LEXIS 5155, at *36 (Tex. App.—Beaumont June 29, 2021, no pet.) (mem. op.) (citing Tex. Prop. Code Ann. § 5.008; *Aflalo v. Harris*, 583 S.W.3d 236, 247 (Tex. App.—Dallas 2018, pet. denied)).

"A buyer who purchases property 'as is' chooses 'to rely entirely upon his own determination' of the property's value and condition without any assurances from the seller." *Williams v. Dardenne*, 345 S.W.3d 118, 123 (Tex. App.—Houston [1st Dist.] 2011, pet. denied) (quoting *Prudential Ins. Co.*, 896 S.W.2d at 161). Under an agreement to purchase something "As Is," the buyer agrees to make his own appraisal of the bargain and accepts the risk that he may be wrong. *Rohrs*, 2021 Tex. App. LEXIS 5155, at **41-42 (citing *Prudential Ins. Co.*, 896 S.W.2d at 161). "'The seller gives no assurances, express or implied, concerning the value or

31

condition of the thing sold[,]' and the buyer chooses to rely completely on his own determination of the condition and value of the purchase, removing the possibility that the seller's conduct will cause him damage." *Id.* (quoting *Prudential Ins. Co.*, 896 S.W.2d at 161). Whether an "As Is" clause is enforceable is a question of law we review de novo. *See Prudential Ins. Co.*, 896 S.W.2d at 161.

An "As Is" clause generally is enforceable if it was a significant part of the basis of the bargain, rather than an incidental or boilerplate provision, and was entered into by parties of relatively equal bargaining position. *Id.* at 162; *Bynum*, 129 S.W.3d at 789. An "As Is" clause is not valid and enforceable if it "'is a product of fraudulent representation or fraudulent concealment by the seller or the seller obstructs the buyer's ability to inspect the property.'" *Rohrs*, 2021 Tex. App. LEXIS 5155, at *40 (quoting *Juda v. Marinemax, Inc.*, No. 01-08-00138-CV, 2018 Tex. App. LEXIS 10640, at *12 (Tex. App.—Houston [1st Dist.] Dec. 20, 2018, no pet.) (mem. op.); *see also Prudential Ins. Co.*, 896 S.W.2d at 161; *Bynum*, 129 S.W.3d at 788-89. To prove fraudulent representation, the plaintiff buyer must show that "the defendant made a material misrepresentation; the defendant was either aware that the representation was false or that he lacked knowledge of its truth; the defendant intended for the plaintiff to rely on the misrepresentation; the plaintiff relied on the misrepresentation; and the plaintiff's reliance caused injury." *Pogue v. Williamson*, 605 S.W.3d 656, 665-66 (Tex. App.—Houston [1st Dist.] 2020, no pet.) (citing *Int'l*

32

*Bus. Mach. Corp. v. Lufkin Indus., LLC*, 573 S.W.3d 224, 228 (Tex. 2019)). An enforceable "As Is" clause negates causation as a matter of law. *Id.* at 665 (citing *Prudential Ins. Co.*, 896 S.W.2d at 161); *see also Williams*, 345 S.W.3d at 124 (citing *Prudential Ins. Co.*, 896 S.W.2d at 161; *Welwood v. Cypress Creek Estates, Inc.*, 205 S.W.3d 722, 726 (Tex. App.—Dallas 2006, no pet.)).

MacPherson did not argue in the trial court and does not argue on appeal that the "As Is" clause was not a significant basis of the bargain, or that he and Aglony had unequal bargaining power, or that he was precluded from inspecting the Property. As for whether Aglony induced MacPherson into buying the Property by making fraudulent representations or by fraudulently concealing material information, the trial court as the trier of fact, heard the testimony from the witnesses and had before it the Seller's Disclosure and other exhibits. The trial court heard Aglony's testimony that she was unaware of any defects or malfunctions in the Property except the driveway (which she disclosed in the Seller's Disclosure), that she instructed the contractors that she hired to remodel the Property to make cosmetic changes, and she was unaware of any structural or foundation repairs made by her contractors or of other defects or malfunctions with the Property. The trial court also had before it the One to Four Family Residential Contract that stated that, at the time the contract was executed, MacPherson had not received the Seller's Disclosure at the time he first entered into the Contract. The trial court also heard

33

evidence that he received the Seller's Disclosure timely under the Contract and that MacPherson could have, but chose not to, cancel the agreement after receiving the disclosure and after having his own inspection. The trial court, as factfinder, was the sole judge of the witnesses' credibility and could have reasonably concluded that Aglony did not make a fraudulent representation or conceal material information that induced MacPherson to enter into the contract. *See City of Keller*, 168 S.W.3d at 827; *Sw. Bell Tel. Co.*, 164 S.W.3d at 625. Therefore, MacPherson failed to meet his burden of proof to establish that the "As Is" clause was unenforceable because it was a product of a fraudulent representation or fraudulent concealment, or that the seller obstructed the buyer's ability to inspect the property.

By purchasing the home "As Is," MacPherson agreed to make his own appraisal of the bargain and to accept the risk as to the quality of the Property and any resulting loss. *See Rohrs*, 2021 Tex. App. LEXIS 5155, at \*\*40-41 (citing *Prudential Ins. Co.*, 896 S.W.2d at 161; *Mid Continent Aircraft Corp. v. Curry Cty. Spraying Serv., Inc.*, 572 S.W.2d 308, 313 (Tex. 1978)). Because the "As Is" clause

here negated causation in MacPherson's DTPA[2], negligence[3], breach of contract[4], and fraud claims[5], we conclude that legally sufficient evidence supports the trial court's Conclusion of Law #3 that no evidence or insufficient evidence supported a finding of liability against Aglony on MacPherson's claims against Aglony. *See*

---

[2] Causation is an element of MacPherson's DTPA claim. *See Prudential Ins. Co. of Am. v. Jefferson Assocs., Ltd.*, 896 S.W.2d 156, 160-61 (Tex. 1995); see also Tex. Bus. & Com. Code Ann. § 17.50(a) (providing that claims brought under DTPA require a showing of "producing cause").

[3] The elements of negligence are legal duty, a breach of that duty, and damages proximately caused by the breach. *Gharda USA, Inc. v. Control Solutions, Inc.*, 464 S.W.3d 338, 352 (Tex. 2015) (citation omitted).

[4] The elements of breach of contract are: (1) the existence of a valid contract, (2) the plaintiff's performance or tendered performance, (3) the defendant's breach of contract, and (4) damages resulting from the breach. *Trahan v. Fire Ins. Exchange*, 179 S.W.3d 669, 674 (Tex. App.—Beaumont 2005, no pet.)

[5] The elements of fraud by nondisclosure are: (1) the defendant failed to disclose facts to the plaintiff, (2) the defendant had a duty to disclose those facts, (3) the facts were material, (4) the defendant knew the plaintiff was ignorant of the facts and did not have an equal opportunity to discover the facts, (5) the defendant was deliberately silent when he had a duty to speak, (6) by failing to disclose the facts, the defendant intended to induce the plaintiff to take some action or refrain from acting, (7) the plaintiff relied on the defendant's nondisclosure, and (8) the plaintiff suffered injury as a result of acting without knowledge. *Rohrs v. Hartz*, No. 09-19-00196-CV, 2021 Tex. App. LEXIS 5155, at *33 (Tex. App.—Beaumont June 29, 2021, no pet.) (mem. op.) (citing *Horizon Shipbuilding, Inc. v. BLyn II Holding, LLC*, 324 S.W.3d 840, 850 (Tex. App.—Houston [14th Dist.] 2010, no pet.)).

The elements of statutory fraud in a real estate transaction are (1) a false representation of a past or existing material fact, when the false representation is (A) made to a person for the purpose of inducing the person to enter into a contract and (B) relied on by that person in entering into the contract; or (2) a false promise to do an act, when the false promise is (A) material, (B) made with the intention of not fulfilling it, (C) made to a person for the purpose of inducing that person to enter into a contract, and (D) relied on by that person in entering into that contract. Tex. Bus. & Com. Code Ann. § 27.01(a).

*Pogue*, 605 S.W.3d at 665 (citing *Prudential Ins. Co.*, 896 S.W.2d at 161); *see also Williams*, 345 S.W.3d at 124 (citing *Prudential Ins. Co.*, 896 S.W.2d at 161; *Welwood*, 205 S.W.3d at 726). We overrule issues two and four.

In MacPherson's first issue, he argues the trial court "committed an error of law by only considering a fraction of Appellant's claims and evidence[.]" On appeal, MacPherson challenges Findings of Fact #1, #2, and #12 and he argues that the last sentence of each of those findings demonstrates that the trial court erroneously limited MacPherson's claims to his reliance on the Seller's Disclosure and erroneously limited MacPherson's claims to events that occurred before the signing of the purchase contract. He also asserts that the trial court erred by not accepting Aglony's prior judicial admission related to floor repairs and her admissions at trial to making repairs that should have been included in the Seller's Disclosure. As the factfinder, the trial court is the sole judge of the credibility of the witnesses and the weight of the evidence and is responsible for resolving conflicts in the evidence and drawing reasonable inferences from basic facts to ultimate facts. *See City of Keller*, 168 S.W.3d at 819-21; *Sw. Bell Tel. Co.*, 164 S.W.3d at 625. The trial court could have chosen to believe one witness over another and could have assigned some or no weight to the discovery responses, and we may not substitute our judgment for that of the factfinder. *See City of Keller*, 168 S.W.3d at 819. MacPherson's first issue challenges findings that we need not examine any further in light of our resolution

36

of issues two and four, which fully support the trial court's judgment. *See* Tex. R. App. P. 47.1.

In his third issue, MacPherson challenges the sufficiency of the evidence supporting the trial court's finding that there was no evidence or insufficient evidence to prove damages. Because we have overruled MacPherson's issues on liability, we need not reach his third issue challenging the sufficiency of the evidence supporting the trial court's finding of no damages. *See id.*

We affirm the trial court's judgment.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on May 13, 2022
Opinion Delivered September 22, 2022

Before Golemon, C.J., Horton and Johnson, JJ.

37